IN THE UNIED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **THOMAS T. TUNSTALL V,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 18-0356-KD-B** |
| | ) | |
| **KIMBERLY M. GLIDEWELL,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>ORDER</u>**

The action is before the Court on the motion for summary judgment, brief and exhibits in support filed by Defendants Kelley O. Edwards and Cynthia T. Mosley (Docs. 122-123); the response, exhibit list and exhibits filed by Plaintiff Thomas T. Tunstall V (Docs. 129, 130); Edwards and Mosley's reply (Doc. 131); and Tunstall's sur-reply (Doc. 132-1).[1]

Tunstall claims while attempting to collect child support from him, two employees of the Baldwin County Department of Human Resources (a division of the Alabama Department of Human Resources), Mosley and Edwards, violated his constitutional right to due process, equal protection and to be free from unreasonable seizures of his property when they knowingly falsified documents and seized his property based on the falsified documents. Upon consideration, and for the reasons set forth herein, summary judgment is GRANTED in favor of Mosley and Edwards.

---

[1] Tunstall's motion for leave to file sur-reply is granted (doc. 132).

## I. Findings of Fact[2]

On September 25, 1992, Tunstall and Kimberly Glidewell entered into a separation agreement which provided for $750.00 per month as child support (Doc. 130-1, p. 2-7). Glidewell then filed a petition for separate maintenance in the Superior Court of Liberty County, Georgia to which Tunstall counterclaimed for divorce. (Id., p. 9-17). The separation agreement was temporarily approved and incorporated into the Court's order on April 22, 1993 (Civil Action No. 93-V-00294) (Id., p. 24-25).   While the petition for separate maintenance was pending, Glidewell filed a petition for divorce in the Georgia Court (Civil Action No. 94-v-01246) (Id., p. 27-29).

The final order in the petition for separate maintenance action was entered on March 3, 1994 and incorporated the settlement agreement (Id., p. 31-32) The Court stated as follows:

> 2. The Agreement between the parties dated September 25, 1992 is approved in its entirety and incorporated into this Order as if fully set forth herein.   Plaintiff and Defendant are ordered to comply with each and every term and provision of said Agreement and this Order.

(Id., p. 32).   The final judgment and decree in the divorce action, entered on October 13, 1994, did not incorporate the settlement agreement and did not include a provision for child support. Glidewell was awarded custody of the minor children (Id., p. 33-35).

Apparently, Tunstall did not comply with his agreement to pay $750.00 per month in child support.   In 1995, Glidewell applied to the Baldwin County Department of Human Resources (BCDHR) for assistance with establishing child support as to Tunstall. Both parties

---

[2] When ruling on a motion for summary judgment, the court resolves all ambiguities and draws all reasonable factual inferences from the evidence in favor of the non-movant. Rice–Lamar v. City of Fort Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000).

then lived in Alabama. Mosley was the financial support worker assigned to the case from January 31, 1995 to September 18, 1997 (Doc. 123-1, p. 29-31, Mosley's Affidavit). As part of her job duties, she signed case summaries which were sent to the District Attorney to prepare petitions or other documents for court. She recognized her signature on Glidewell's 1995 case summary. Glidewell's child support case summary was signed on March 29, 1995 (Id.)   As "Facts relating to the case", Mosley noted

> Please establish child support. Divorce was obtained by default as I understand it and the separation agreement was never filed in court by client's attorney.

(Doc. 130-1, p. 37-38).

In 1995, the District Attorney, on behalf of Glidewell, filed a petition for support in the Juvenile Court of Baldwin County, Alabama (Doc. 130-1, p. 40-41). Support was established on June 24, 1995, at $370.00 per month (Id., p. 48-49) and amended to $574.00 per month on February 1, 2004 (Doc. 130-1, pp 65-66); (Id., p. 201-206, Payment Summary from July 20, 1995 through May 3, 2017). Tunstall was served with notice of the hearing, was present in court and signed an Alabama income affidavit form (Doc. 123-1, p. 39-44).

In 1995, URESA (Uniform Reciprocal Enforcement of Support Act) provided that child support orders were cumulative and did not supersede or replace a previous order from a different state.[3]  In December 1999, URESA was repealed and replaced with the UIFSA

---

[3]  Alabama Code Sec. 30-4-93(b) provided as follows:
(b) Any order of support issued by a court of this state when acting as a responding state shall not supersede any previous order of support issued in a divorce or separate maintenance action, but the amounts for a particular period paid pursuant to either order shall be credited against amounts accruing or accrued for the same period under both.

(Uniform Interstate Family Support Act). The UIFSA did not allow for multiple orders in multiple states.

On March 2, 2008, Tunstall's child support obligation set by the Alabama Juvenile Court was terminated. (Doc. 130-1, p. 86). At that time, the District Court of Baldwin County, Alabama determined Tunstall owed an arrearage of $8,281.55, based on the support order in Alabama (Id.). Tunstall was ordered to pay $574.00 per month toward the arrearage. (Id.)

On or about September 30, 2008, Glidewell began the process of obtaining past due child support from Tunstall in Louisiana. Tunstall had moved to Louisiana in 1998 (Doc. 7-1). Glidewell filed an Affidavit of Past Due Support with the BCDHR showing a "Total Principal Only" of $68,806.05 as of September 30, 2008. (Doc. 130-1, p. 177). This figure was based on the $750.00 per month previously ordered by the Georgia Court.   She listed no payments from October 1992 to June 1995, and starting July 1995, when the Alabama Juvenile Court ordered Tunstall to pay $370.00 per month (amended to $574.00 per month in February 2004), she listed payments from Tunstall in that amount, as well as other payments, as a credit against the $750.00 owed monthly (Id., p. 173-177). At the time that the Alabama Juvenile Court entered the support order, it was possible to have more than one valid support order from different states.

In October 2008, a BCDHR Child Support Enforcement Transmittal was sent to the Louisiana Department of Child and Family Services.   The Transmittal requested "Registration of a Foreign Support Order" and showed an arrears of $68,806.05 and accrued interest in the amount of $81,311.12, for a total owed of $150,117.17 (Doc. 123-1, p. 53). Certified copies of the three Georgia Court orders and the separation agreement were attached to the Transmittal, but not the Alabama Juvenile Court orders (Id., p. 53-70).

Edwards was the financial support worker assigned to the child support case from November 8, 2000 to October 31, 2008. She signed the Transmittal and Registration Statement on October 31, 2008. (Doc. 123-1, p. 49-51, Edwards' Affidavit). Mosley, a notary, notarized Edward's signature on the Registration Statement on October 31, 2008, but she did not perform any work on Glidewell's case. Mosley stated that by notarizing Edwards' signature, she "was authenticating that it was Kelley Edwards who was signing the document" and "was not authenticating the underlying documents" and did "not remember being aware of their content" (Doc. 123, p. 30-31, Mosley's Affidavit).

The State of Louisiana filed a petition on behalf of Glidewell (Doc. 130-1, p. 109-110). A hearing was held in January 2010, at which Tunstall appeared. (Doc. 123-1, p. 72-74).   On January 12, 2010, the Louisiana Court dismissed the petition to register the foreign order, for contempt, income assignment and medical support (Doc. 123-1, p. 74). On April 1, 2010, a letter was sent to Tunstall notifying him of the dismissal and stating that the Louisiana Department of Social Services "will no longer pursue the court order for child and/or medical support…."(Id., p. 75).

Glidewell then attempted to collect the support order of the Georgia Court in an Alabama Juvenile court. In June 2010 Glidewell filed a motion in the Baldwin County Juvenile Court to pursue the past due support based upon the Georgia Court orders. (Doc. 123-1, p. 105-119). Thereafter, a default judgment was entered April 18, 2011 by the Juvenile Court awarding Glidewell $171,680.62 including child support arrearage plus interest, attorney fees and court costs. (Doc. 130-1, p. 223).

On or about March 18, 2013, a motion for contempt was filed by the Louisiana District Attorney in the Louisiana court on behalf of Glidewell. (Doc. 130-1, p. 120-122). Tunstall claims

that this contempt proceeding was initiated by former defendant Daigle, an employee of the

Louisiana Department of Family and Children Services. (Doc. 7, p. 8). Tunstall also claims that

Daigle falsified documents to indicate, inter alia, that he owed an arrearage in excess of

$171,680.62. (Id.)   According to Tunstall, a contempt hearing was held on April 3, 2014, and it

was at this hearing he became aware of the default judgment entered by the Alabama Juvenile

Court. (Doc. 7, p. 13).   Also according to Tunstall, on June 15, 2015, the Louisiana Court held

Tunstall in "criminal contempt" of the April 18, 2011 Alabama default judgment (Doc. 7, p. 10).

He alleges he was sentenced to "30 days confinement, suspended upon payment of $7,500.00"

with two years of probation, and ordered to pay the arrearage (Id.).[4]

Tunstall then sought in the Circuit Court of Baldwin County, Alabama to alter, amend or

vacate all the orders entered in the Alabama Juvenile Court on grounds, among others, that the

Juvenile Court lacked subject matter jurisdiction because the State of Alabama had failed "to

register or domesticate the foreign judgment of child support from Georgia" (Doc. 7-7). On

March 10, 2017, his motions were granted, all orders were vacated, and the action dismissed

(Id.). The Circuit Court stated "[t]he Orders of the Georgia Court remain the only remaining

valid orders of record in this matter." (Id., p. 3) The order was amended April 11, 2017, to reflect

dismissal without prejudice (Id., p. 5).

---

[4]   Tunstall also claims that Daigle's transmittal of false documents between July 2012 -Feb
2019, from 2012 through 2014, resulted in suspension of Tunstall's drivers, hunting and fishing
licenses, suspension of his passport, attempts to seize his income tax returns, garnishment of
payroll, denials of loan applications, loss of business interests and opportunities, loss of
employment, and criminal contempt (Doc. 7, p. 8-10). Orders were entered in the Louisiana
Court in July 2017 (Doc. 130-1, p. 137-139) and February 2018 (Doc. 130-1, p 141-142),
dismissing the contempt actions.

On May 3, 2017, Glidewell obtained a Child Support Enforcement Transmittal to the Baldwin County District Attorney's Office to register the Georgia Court orders as foreign support orders. Then on or about May 22, 2017, the District Attorney filed an action in the Circuit Court of Baldwin County (Case No. 2017-9000632.00) (Doc. 130-1, p. 124-126, 128).

Review of the 2017 Registration Statement and Transmittal from the BCDHR that was provided to the District Attorney, shows that neither Edwards nor Mosley signed the documents. Instead, Kay Arnold, as Records Custodian, signed the Registration Statement and indicated she was the "Initiating Contact Person" on the Transmittal (Doc. 130-1, p. 124-126).

Glidewell also filed a motion in the Circuit Court of Baldwin County to vacate the March/April 2017 order (Doc. 130-1, p. 144-145). On June 29, 2017, after reconsideration of its order, the Circuit Court found that the Juvenile Court did have subject matter jurisdiction and the initial order of support dated June 24, 1995 was valid. (Doc. 130-1, p. 147-149)   The Circuit Court then entered judgment for past due support and interest in favor of Glidewell in the amount of $10,127.87. However, the Circuit Court also found that the default judgment for $171,680.62 was void (Doc. 130-1, p. 147-149).[5]

On July 26, 2017, Glidewell moved to dismiss the Circuit Court action(Case No. 2017-9 However, Tunstall had appealed the Baldwin County Circuit Court's decision to vacate 0and amend. On September 22, 2017, the Alabama Court of Civil Appeals determined that 0Glidewell's motion to vacate was untimely, and therefore, the Circuit Court lacked jurisdiction to 0

---

0[5] Throughout the third amended complaint, Tunstall frequently refers to the default judgment as "void" or as "known void" and attributes to Glidewell, Edwards and Mosley knowledge that the 0default judgment was void (Doc. 7). However, the evidence indicates that the default judgment was not found void until 2017, after Glidewell, Edwards and Mosley allegedly took action on the 0default judgment.

0

0

consider her motion to vacate, and thus lacked jurisdiction to vacate or amend its order. Ex parte T.T.T., 249 So. 3d 514 (Ala. Civ. App. 2017). The March/April 2017 order of dismissal wherein the Circuit Court recognized the Georgia Court orders as valid, was reinstated (Doc. 7-11).[6] However, it was not until June 11, 2018 that the Circuit Court entered orders of dismissal in all pending actions related to the original Juvenile Court action. (Doc. 7-12)

Between November 3, 2017 and October 4, 2019, Edwards was reassigned to Glidewell's case. During this time, there is no evidence that Edwards initiated any enforcement action against Tunstall.   Edwards avers that she did not initiate any enforcement action or collection action. (Doc. 123-1, p. 49-51).

Edwards' job duties are outlined in her affidavit (Id., p. 48-50). Among others, her duties included "interviewing new child support cases to obtain pertinent information to locate absent parents, establish paternity, child support, or to enforce an existing order, … reviewing case material and verifications to determine appropriate actions, and if necessary, completing proper documents according to the Child Support Enforcement Policy and Procedures Manual for referral to the Department's attorney's office for proper legal action or initiate other administrative enforcement actions, . . . reviewing court orders loaded on the child support computer system, ALECS, for accuracy in the course of case management and, at other possible times, and if necessary, to correct the information, load orders, recalculate the balances, complete spreadsheets, complete adjustments, etc., in order to maintain accurate financial information on the system." (Id.).

---

[6] In the reinstated order the Circuit Court stated "[t]he Orders of the Georgia Court remain the only remaining valid orders of record in this matter." (Doc 7-7, p. 3).

As it relates to how child support is collected and arrearages reported, Clifford Smith, the

Program Manager for Policies and Procedures for the Alabama Department of Human

Resources, avers that

> The Department's child support computer is called Alabama's Location
> Enforcement and Collection Systems (ALECS). ALECS is programmed to
> automatically send monthly statements to certain non-custodial parents.
> Individual caseworkers do not send monthly statement to non-custodial parents.

(Doc. 123-1, p. 34).

> He also avers that:

> Federal law requires that the Department report certain child support
> information to consumer reporting agencies. The credit reporting process is
> automated and executed by the Department's child support computer, ALECS,
> at the end of the month. Individual case workers do not report child support
> information to consumer credit reporting agencies.

(Id., p. 34).


## II. Counts I and II claiming violations of Tunstall's Constitutional Rights

In Count I, Tunstall claims that Edwards and Mosley violated his right to due process and

equal protection by knowingly transmitting in September/October 2008 false documents to

Louisiana[7] that indicated he owed the child support ordered by the Georgia Court. Tunstall's

claim of falsification of documents is based on his allegation that there was no final Georgia

Court order requiring him to pay child support in the amount of $750.00 per month.   Thus the

---

[7] The allegedly falsified "official state documents" appear to be the 2008 Transmittal to
Louisiana (Doc. 130-1, p. 93-96).

2008 Transmittal was falsified by indicating a "Date of Support Order" of "October 1, 1992" (to show that he was subject to a child support order from Georgia), when no such ordered existed. Tunstall also alleges that Mosley and Edwards used these documents to obtain the April 2011 Alabama default judgment and to procure the June 15, 2015 Louisiana contempt order (Doc. 7, p. 14).

In Count I, Tunstall also alleges that between November 1, 2017 – September 1, 2018, Mosley and Edwards violated his right to equal protection by refusing to recognize final orders of the courts, and then falsified documents that claimed that the Georgia Court entered judgment against him in the amount of $18,347.47 (Doc. 7, p. 16).

In Count II, Tunstall claims that Edwards and Mosley "while acting under the color of law, unlawfully used their authority to falsify the official state documents … to seize Plaintiff's property between September 30, 2008 – July 27, 2017, and transfer the same to Glidewell" in violation of the Fourth Amendment (Doc. 7, p. 17). He alleges that their "continued possession, control and disposal of" the unlawfully seized property "presents a continuing violation" of his "constitutional rights guaranteed by" the Fourth Amendment (Id.). Tunstall seeks return of "all moneys unlawfully seized by and in the possession of Defendants" Edwards and Mosley "between September 30, 2008 – July 27, 2017". (Id.)


## III. Statute of limitation as to Counts I and II

Edwards and Mosley argue that the claims against them are barred by the two-year statute of limitation for Section 1983 actions alleging personal injury (Doc. 123, p. 19). Section 1983 actions alleging personal injury are subject to a two-year statute of limitation.  The "governing statute of limitations for claims raised in § 1983 actions is the forum state's general or residual

10

statute of limitations for personal injury actions . . . and this limitations period is two years."
Beaty v. H&W Tire & Auto, Inc., 2021 WL 1343048, at *1 (M.D. Ala. Apr. 9, 2021) (citing
Owens v. Okure, 488 U.S. 235, 249–250 (1989); McNair v. Allen, 515 F.3d 1168, 1173 (11th
Cir. 2008); Ala. Code § 6-2-38(l)).

The time at which the statute of limitations for a § 1983 claim accrues "is a question of
federal law that is . . . governed by federal rules conforming in general to common-law tort
principles." Wallace v. Kato, 549 U.S. 384, 387-88 (2007). "Under those principles, it is the
standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action,
that is, when the plaintiff can file suit and obtain relief." Id. (internal citations and quotation
marks omitted). In § 1983 cases, "the statute [of limitations] does not begin to run until the facts
which would support a cause of action are apparent or should be apparent to a person with a
reasonably prudent regard for his rights." Mullinax v. McElhenney, 817 F.2d 711, 716 (11th Cir.
1987) (citations and internal quotation marks omitted). Thus, a cause of action under § 1983 will
not accrue "until the plaintiffs know or should know (1) that they have suffered the injury that
forms the basis of their complaint and (2) who has inflicted the injury." Chappell v. Rich, 340
F.3d 1279, 1283 (11th Cir. 2003) (per curiam) (citing Mullinax, 817 F.2d at 716); Smith v.
Shorstein, 217 F. App'x 877, 881 (11th Cir. 2007) (per curiam).

Mosley states that she was the financial support worker on Tunstall's case from 1995
through 1997, and had no further involvement but to notarize Edwards' signature in October
2008 (Doc. 123-1, p. 29-31). Mosley argues correctly that Tunstall knew or should have known
of her involvement in 1995, "when the child support order was entered in Baldwin County
Juvenile Court Case Number CS 1995-166.00." (Id.)   She points out that "Tunstall was served
on May 9, 1995 and the court order indicates he was present and participated in the court

11

proceeding" (Id.).    Tunstall has failed to offer any evidence otherwise and Tunstall states that

the "claims asserted in the third amended complaint (complaint) are limited to those actions

taken against Plaintiff, by Defendants, subsequent to September 30, 2008" (Doc. 129, p. 7).    The

evidence indicates that Mosley's only involvement subsequent to September 2008, was as a

notary on the 2008 Transmittal documents.    Mosley argues that the notarization of the 2008

documents in no way extends the limitations period to file a claim. The Court agrees. The

Registration Statement shows that Mosley, as "Notary Public, Court/Agency Official and Title"

signed to verify that the Statement was "sworn to and signed before" her by Edwards.    There is

no claim that the signature was fraudulent.    Accordingly, any possible action for claims asserted

in Counts I and II against Mosley has expired.

Edwards was assigned to the case from November 8, 2000 to October 31, 2008 and was

reassigned from November 3, 2017 until October 4, 2019 (Doc. 123-1, p. 49-51).    Tunstall's

first assertion in Count I against Edwards is based on the October 2008 Transmittal.    However,

as Edwards argues, Tunstall knew or should have known of her involvement in this transmittal

when the October 2008 Transmittal was registered in Louisiana and court proceedings

commenced. She points out that Tunstall participated in the Louisiana court proceedings and

would have been privy to the documents containing her signature. Tunstall does not refute this

allegation.    On January 12, 2010, the Louisiana court dismissed the petition to register the

foreign support order, thus ending any proceeding related to the alleged false documents

transmitted by Edwards.    Accordingly, Edwards correctly asserts that the two year statute of

limitations expired, at the latest, on January 13, 2012.

However, Tunstall attempts to extend the statute by alleging that Edwards used the

allegedly false 2008 Transmittal documents to obtain the April 2011 Alabama default judgment

and to procure the June 2015 Louisiana contempt order.   However, neither allegation is supported by any evidence.   Tunstall has failed to present any evidence that Edwards participated in anyway in obtaining the Alabama 2011 default judgment or that the 2008 allegedly false Transmittal was used to obtain the 2011 default judgment. The only evidence of record as to the bases of the 2011 default judgment is the Georgia separation agreement and Georgia Court orders order submitted by Glidewell in support of her motion. (Doc. 123-1, p. 105-119).[8]

As to the allegation that the 2008 Transmittal was used to procure the 2015 Louisiana contempt order, again the only evidence of record indicates otherwise.   Tunstall claims that the contempt proceeding alleged arrearage of $171,690.62 (Doc. 7, p.t 8) and that the Louisiana Court found him in criminal contempt of the April 2011 Alabama default judgment (which ordered him to pay $171,690.62). (Doc. 7, p. 10) Thus it was the Alabama default judgment that formed the basis of the contempt.   There simply is no evidence that the 2008 Transmittal was used to obtain the contempt order.

Thus, neither the Alabama default judgment proceedings nor the subsequent proceedings in Louisiana extend the statute of limitations on any § 1983 action based on the allegedly false 2008 Transmittal documents.

## IV. Qualified immunity

---

[8] To the extent Count I is based on the 2017 Transmittal, the uncontradicted evidence shows that Edwards and Mosley were not involved in the May 2017 Transmittal to the Alabama District Attorney (Doc. 123, p. 49-51, p. 29-31). Kay Arnold signed the Transmittal and the Registration Statement (Doc. 130-1, p. 124-126).

Edwards argues she is entitled to qualified immunity as to the remaining constitutional claims.

> Qualified immunity protects government officials who are sued under § 1983 for money damages in their individual capacities. Immunity is appropriate so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
>
> To avail oneself of qualified immunity, one must establish "that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." Sims v. Metropolitan Dade County, 972 F.2d 1230, 1236 (11th Cir. 1992). If so, courts then must determine whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right" that was clearly established at that time. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). To determine if a right is clearly established, we ask whether the state of the law on the date of the alleged misconduct placed defendants on "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

Hardigree v. Lofton, - - - F. 3d - -, 2021 WL 1257244, at *3 (11th Cir. Apr. 6, 2021).

"[W]hen a defendant raises qualified immunity, a district court cannot simply deny that defendant's summary judgment motion because the facts are disputed. It must consider 'the plaintiff's best case in hand' and determine whether those facts give rise to a constitutional violation, and, if so, whether that violation breached a clearly established right." Gloston by Gloston v. Vance, 789 F. App'x 845, 846–47 (11th Cir. 2020) (citation omitted).

If Edwards establishes that she was acting within the scope of her discretionary authority, the burden shifts to Tunstall, "to establish (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Mpaka v. Jackson Memorial Hospital, 827 F. App'x 1007, 1009 (11th Cir. 2020)

(citation omitted).   "Although courts need not address these two prongs in sequential order, both prongs must be met to deny an official qualified immunity." (Id.) (citing <u>Roberts v. Spielman</u>, 643 F.3d 899, 904 (11th Cir. 2011)).

Edwards argues that at all times she acted within the scope of her discretionary authority as a financial support worker. Edwards argues that her legitimate job-related functions were to locate absent parents, review case materials to determine appropriate actions, complete documentation for that action, enforce existing orders, investigate income for purposes of collection or enforcement of support, review "court orders loaded on the child support computer system, ALECS, for accuracy in the course of case management" and if necessary, "to correct the information, load orders, recalculate the balances, complete spreadsheets, complete adjustments, etc., in order to maintain accurate financial information on the system" (Doc. 123, p. 11-12).

In determining whether Edwards was performing a discretionary function, the Court considers whether they were "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [their] power to utilize." <u>Holloman ex rel. Holloman v. Harland,</u> 370 F.3d 1252, 1265 (11th Cir. 2004). "In applying each prong of this test, [a court] look[s] to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." <u>Id</u>. at 1266. "To that end, 'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.' " <u>Gray ex rel. Alexander v. Bostic</u>, 458 F.3d 1295, 1303 (11th Cir. 2006) (quoting <u>Harbert Int'l v. James</u>, 157 F.3d 1271, 1282 (11th Cir.1998)).

15

The Court finds that Edwards was acting within the scope of her discretionary authority. Alabama Code § 38–10–3, provides that the "Department" which is defined to include the Alabama Department of Human Resources and county departments of human resources, "shall operate child support programs as may be required under the provisions of Title IV–D [of the Social Security Act], including, but not limited to, locating absent parents, establishing paternity, establishing or modifying support orders, enforcing support obligations and related matters, as described or defined by the Social Security Act and amendments thereto." Ala. Code § 38–10–3(a). Looking at the general nature of Edwards and Mosley's actions and putting aside other concerns as expressed by Tunstall, establishes that their actions were taken in performance of their legitimate job-related duties as financial support workers, using means within their power to process child support applications, and "if done for a proper purpose", would be within the perimeter of their official discretionary duties. See Bush v. Frazier, No. 2:18-CV-00732-SGC, 2019 WL 3305145, at *7 (N.D. Ala. July 23, 2019) ("Applying this standard, it is clear the conduct challenged by the plaintiff occurred within the performance of the individual defendants' job-related functions through means within their power to utilize. A function of ADHR and, specifically, its Child Support Enforcement Division, of which the individual defendants are agents, is to collect child support, and garnishments and judicial actions are within its arsenal of tools to accomplish this goal.").

The burden now shifts to Tunstall "to establish (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." Mpaka, 827 F. App'x at 1009.   "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202, 121

16

S.Ct. 2151 (2001). "A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the 'preexisting law dictates, that is, truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." Marsh v. Butler County, Ala., 268 F.3d 1030-1031 (11th Cir. 2001).

### A) **Count I**

The remaining claim in Count I is that between November 1, 2017 – September 1, 2018, Edwards violated Tunstall's right to equal protection by refusing to recognize final orders and falsifying documents that claimed that the Georgia Court entered judgment against him in the amount of $18,347.47.   (Doc. 7, p. 16).   In response to summary judgment, Tunstall states his right to equal protection was violated when records were falsified to indicate that the Georgia Court entered a support order on October 1, 1992, in order to manufacture a basis to civilly and criminally prosecute him. (Doc. 129, p. 19-20)   In support, Tunstall cites the May 3, 2017 Registration Statement initiated by Kay Arnold regarding arrearage owed of $108,719.04. (Id., Doc. 130-1, p. 124-126).   However, there is no evidence that Edwards had anything to do with this Registration.   The unrefuted evidence is that Edwards was not assigned Tunstall's case between October 2008 and November 2017, and that she was reassigned to Tunstall's case beginning November 3, 2017.

The only discernable allegation of fact aligned with this claim, not previously addressed, is Tunstall's allegation that between November 1, 2017 – September 1, 2018, Edwards propounded "monthly demands for payment, threatening civil and/or criminal prosecution if Plaintiff failed to effect payment in full." (Doc. 7, p. 12)   The only possible evidence submitted

17

in support of this claim is found in two child support statements dated November 1, 2017 and February 2, 2018 showing balances owed of $16,325.59 and $17,182.11, each based on a beginning child support balance of $7,669.76. (Doc. 130-1, p. 220-221)   Thus, although he alleges actions continuing until September 1, 2018, Tunstall fails to submit any evidence of any demands/threats made after February 2018.

Although the Court must view the facts in the light most favorable to Tunstall, there is simply no evidence from which the Court could imply that Edwards was responsible for sending the November 1, 2017 or the February 2, 2018 monthly statements to Tunstall or threatening any actions against Tunstall. And Edwards specifically avers that she did not send monthly statements or threaten prosecution (Doc. 123-1, p. 51, Edwards' Affidavit) (see also Smith Affidavit, Doc. 123-1, p. 34, "ALECS is programmed to automatically send monthly statements to certain non-custodial parents. Individual caseworkers do not send monthly statement to non-custodial parents." )

Liberally construed, Tunstall's complaint appears to be that between November 2017 and September 2018, Edwards failed to update ALECS with the court orders that indicated he did not owe any child support. And as a result he was sent the two statements (dated November 1, 2017 and February 1, 2018) demanding payment of $574.00.   From this he claims he was treated differently than other non-custodial parents.

When assigned to Tunstall's case, Edwards was responsible for updating ALECS, which generated the child support statements. However, Edwards was not assigned to the case when the November 1, 2017 statement was generated, and had not been assigned to the case since October 2008.

18

As for the February 2018 statement, Tunstall's claim fails for lack of factual support that at the time ALECS generated the statement, the statement was incorrect. On June 29, 2017 the Circuit Court found that the June 24, 1995 initial support order of $370.00 (modified to $574.00 on February 1, 2004) was valid. (Doc. 130-1, p. 147-149)   On September 22, 2017, the Alabama Civil Court of Appeals found that the Circuit Court was without subject matter jurisdiction to order child support (because the Georgia Court order had never been domesticated or registered in Alabama) and ordered the Circuit Court of Baldwin County to vacate all support orders. The June 29, 2017 was vacated by the Circuit Court on March 30, 2018. (Doc. 7-11) So until the June 29, 2017 order was vacated as directed, and BCDHR was made aware, it is reasonable that ALECS would not be updated by the BCDHR.   Accordingly, Tunstall's remaining claim in Count I is without sufficient factual support to withstand summary judgment as to Edwards' claim of qualified immunity.

### B) <u>Count II</u>

The right to be free from unreasonable seizure of property is clearly established. U.S. Const. Amd. IV. To establish a Fourth Amendment claim, Tunstall must show that his property was seized and that the seizure was unreasonable. <u>See Hoefling v. City of Miami</u>, 811 F.3d 1271, 1281 (11th Cir. 2016) (citing <u>Soldal v. Cook County, Illinois</u>, 506 U.S. 56, 71, 113 S. Ct. 538 (1992)).

In Count II, Tunstall claims that Edwards "while acting under the color of law, unlawfully used their authority to falsify the official state documents … to seize Plaintiff's property between September 30, 2008 – July 27, 2017, and transfer the same to Glidewell" in violation of the Fourth Amendment (Doc. 7, p. 17).   He alleges that it was "clearly established

by the Georgia court on October 13, 1994 and the Louisiana court on January 12, 2010 Plaintiff

and his property were not subject to seizure." (Id.)    In his response to summary judgment,

Tunstall clarifies his claim as follows:

> All monies seized from Plaintiff in Louisiana between October 31, 2018 [sic]
> through July 6, 2017, were done so pursuant to the known falsified enforcement
> transmittal and registration statement executed by Defendants.    Those monies were
> transferred to ADHR/BCDHR and applied toward satisfaction of the judgment
> Defendants falsified official state record to indicate was entered by the Georgia
> Court on October 1, 1992, in case No. 94-V-01246.[9]

(Doc. 129, p. 20).

In support of this factual allegation, Tunstall cites to two exhibits. The first exhibit is a

Louisiana child support statement, dated April 10, 2017, which shows an arrears of $167,106.79

(and payments collected of $3,383.08). (Doc. 130-1, p. 193-199)    This statement also indicates

the first collected payment was in April 2014 and the last payment collected was in October

2014. (Id., p. 196-197)    This document in no way indicates that the basis for the collection

efforts was the 2008 Transmittal from Edwards.    The only reasonable inference that could be

drawn from the evidence of record is that the 2014 collections reflected on the Louisiana support

statement was the result of the April 3, 2014 contempt hearing (which was based on the 2011

Alabama default judgment). [10]    And as previously explained, Tunstall has failed to present any

---

[9]  Tunstall also argues that his arrest in Louisiana constituted a seizure in violation of the Fourth
Amendment (Doc. 129, p. 22). In his third amended complaint, Tunstall does allege that the
"Georgia court on October 13, 1994 and Louisiana Court on January 12, 2010" established that
"Plaintiff and his property were not subject to seizure" (Doc. 7, p. 17, ¶ 61). However, Tunstall
**did not** allege a Fourth Amendment claim for damages based upon seizure of his person.

[10]  The fact that some payments were made after the contempt hearing may explain why a
contempt order was not entered until June 15, 2015, at which point several months had passed
without payment.

evidence that Edwards participated in anyway in obtaining the Alabama 2011 default judgment or that the 2008 allegedly false Transmittal was used to obtain the 2011 default judgment.

The second document submitted in support of his Fourth Amendment claim is a State of Alabama Court Order Payment Summary, dated May 3, 2017, showing payment due of $574.00 and an arrearage of $76,630.16 in child support, and what appears to be $32,088.88 interest owed. (Doc. 130-1, p. 201-206)   The Summary indicates payments beginning in July 1996, and the last payment received in November 2014. (Id., p. 201)   The payments received appear to track the amounts the Alabama courts ordered between June 1995 and November 2014. (Doc. 130-1, pp. 48, 61, 65, 71, and 86)   Therefore, any seizure that occurred was based on a valid court order at the time and was objectively reasonable. Accordingly, Edwards is entitled to qualified immunity for any alleged participation she had in the alleged seizures.


## V. Count IV

Tunstall raises a state law claim of defamation against Edwards and Mosley (Doc. 7, p. 20-21). He alleges that Edwards and Mosley, beginning July 2017 until August 31, 2018, transmitted monthly reports to credit reporting agencies which contained false and defamatory information that he owed a child support arrearage of $7,958.00 and because of this Transmittal, he "has been denied credit and will be precluded from obtaining any credit until August 2025." (Doc. 7, p. 12-13, 21). He also alleges that from 2008 until July 27, 2017, Edwards and Mosley transmitted false and defamatory information to credit reporting agencies and published on public internet websites that he owed $150,171.17 in child support (Id., p. 11).[11]

---

[11] The Court previously determined that his claims for defamation based on publication that occurred before August 13, 2016 were barred by the statute of limitation (Doc. 89, p. 14).

A defamation action requires Tunstall to prove: 1) that Edwards and Mosley made a false and defamatory statement concerning the plaintiff; 2) in an unprivileged communication to a third party; 3) with fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. Target Media Partners v. Specialty Mktg. Corp., 828 F. App'x 681, 683 (11th Cir. 2020).[12]

Edwards and Mosley now move for summary judgment as to this claim. As movants, they have the burden to present evidence and affidavits to establish the absence of any genuine, material factual dispute." Procaps S.A. v. Patheon, Inc., 845 F.3d 1072, 1079 (11th Cir. 2016). Here, Edwards and Mosley have presented their affidavits stating that they did not publish any information to credit reporting agencies and the affidavit of Clifford Smith, the Program Manager for Policies and Procedures for the Alabama Department of Human Resources (Doc. 123-1, p. 32-34). Smith states that

> Federal law requires that the Department report certain child support information to consumer reporting agencies. The credit reporting process is automated and executed by the Department's child support computer, ALECS, at the end of the month. Individual case workers do not report child support information to consumer credit reporting agencies.

(Id., p. 34).

Tunstall responds only as to Edwards, apparently abandoning this claim as to Mosley (Doc. 129, p. 23-24). Accordingly, summary judgment is due to be granted in Mosley's favor.

---

[12] "There are two types of defamation: libel, which involves the use of print media to publish a defamatory comment; and slander, which involves the oral expression of a defamatory comment." Jones v. Bank of Am., N.A., No. 2:18-CV-0512-JEO, 2019 WL 2744470, at *10 (N.D. Ala. July 1, 2019).

Barber v. Corizon Health, 2018 WL 1579472, at *10 (N.D. Ala. Mar. 30, 2018) (finding that "[a]lthough Barber does not explicitly state he intends to concede this claim, he does not discuss it at all in his response. Therefore, he has abandoned the claim") (citing Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

As to Edwards, the only evidence Tunstall cites to support his defamation claim against Edwards is a TransUnion credit report that shows an adverse account from the Alabama Department of Human Resources with a balance owed of $7,958 (Doc. 130-1, p. 212) and a Credit Karma report showing the same (Id., p. 214-215). Each document indicates that the account was closed on August 31, 2018.   From these documents, Tunstall leaps to the conclusion that Edwards provided the allegedly false information[13] to the credit reporting agencies.

However, the only evidence of record regarding this claim shows that Edwards did not communicate with the credit reporting agencies. (Doc. 123-1, p. 49-51, Edwards' Affidavit and Doc 123-1, p. 24, Smith's Affidavit).   She may have entered information into the ALECS, which then generated a report containing the information, but there is no evidence that Edwards communicated or sent the any information to the credit reporting agency on behalf of the Alabama Department of Human Resources. Tunstall's conclusory allegation that Edwards

---

[13]  The Court is unable to make any determination as to whether the information communicated to the credit report agencies was false at the time it was communicated because there is no information when the information was communicated.   The Court notes that at least prior to March 2018, when the Alabama Circuit Court orders were vacated, the information does not appear to be false.

published the information is not sufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). Accordingly, summary judgment is due to be granted in Edwards' favor.

Additionally, Tunstall now argues that because Edwards was "responsible for reviewing court orders, loading court orders . . . maintaining accurate financial information on ALECS", she knew or should have known that the child support orders had been vacated and cases dismissed. He also argues that as his caseworker, she "had actual knowledge no order or judgment had been entered in any case finding Plaintiff owed $7,985.00 in support arrears since July 1, 1995" (Doc. 129, p. 22-23).

Based on the above, Tunstall now claims that Edwards violated several provisions of the Alabama Department of Human Resource's Administrative Code § 660-1-6.08(6)(a), which prohibit the dissemination of information to a consumer credit reporting agency unless certain criteria are met, including an arrearage of more than $1,000 and notice to the non-custodial parent. [14]  However, to the extent Tunstall is asserting a new claim, he cannot amend his complaint to add a new claim that Edwards violated Alabama regulations by raising the claim in response to a motion for summary judgment. GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258 n. 27 (11th Cir.2012), cert. denied, 566 U.S. 1088, 133 S. Ct. 856 (2013) (finding that

---

[14]  Tunstall also argues that Edwards violated 42 U.S.C. §§ 231.108(c) and 42 U.S.C. §§ 231.1145(a), (b) & (d), by publishing false information to the consumer credit reporting agencies that he owed more than $1,000 in child support arrears, failing to give him prior notice, and failing to provide updated accurate information. The cite appears to be incorrect. 42 U.S.C. § 231 does not address this issue. That section is captioned "Service and Supply Fund; Uses; Reimbursement" for the Public Health Service. The Court did locate Tex. Fam. Code Ann. § 231.108(c) and § 231.114(a), (b) & (d) which might be the source of Tunstall's argument.

plaintiff was precluded from amending its complaint "through argument at the summary judgment phase of proceedings").

## VI. <u>Conclusion</u>

For the reasons set forth herein, Edwards and Mosley's motion for summary judgment is GRANTED. Accordingly, this action is DISMISSED with prejudice. Judgment shall be entered by separate order as provided in Fed. R. Civ. P. 58(a).

**DONE** and **ORDERED** this the 7th day of May 2021.


 **s/ Kristi K. DuBose**
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**